## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOPE AMSPACHER, | : | |
| ADMINISTRATOR OF THE | : | |
| ESTATE OF ZACHARY KIRCHNER, | : | |
| and MATTHEW KIRCHNER, | : | NO. |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| RED LION AREA SCHOOL | : | JURY TRIAL DEMANDED |
| DISTRICT, JASON M. HOFFMAN, M.A., | : | |
| OFFICER MARC GREENLY, | : | |
| L.D., a minor, D.M., a minor, | : | |
| T.F., a minor, C.H., a minor, | : | |
| W.G., a minor, and C.W., a minor, | : | |
| *Defendants*. | : | |

## COMPLAINT

AND NOW, comes Plaintiffs, HOPE AMSPACHER, ADMINISTRATOR OF THE ESTATE OF ZACHARY KIRCHNER, and MATTHEW KIRCHNER, through counsel, who file this Complaint against Defendants, RED LION AREA SCHOOL DISTRICT, JASON M. HOFFMAN, M.A., OFFICER MARC GREENLY, L.D., a minor, D.M., a minor, T.F., a minor, C.H., a minor, W.G., a minor, and C.W., a minor, and on Plaintiff's own knowledge, and otherwise upon information and belief, Plaintiff avers as follows:

## PARTIES

1

**Plaintiffs**

1.      Hope Amspacher ("Amspacher") is an adult resident of York County, Pennsylvania.  Amspacher brings this action as the mother of Zachary Kirchner ("Decedent") and as Administrator of the Estate of Zachary Kirchner, having been granted letters of administration by the York County Register of Wills on November 3, 2022.

2.      Amspacher brings this action under 42 Pa.C.S. § 8301 and § 8302 on behalf of the Estate and for the benefit of Decedent's wrongful death and survival beneficiary(ies).

3.      Amspacher brings a wrongful death claim under 42 Pa.C.S. § 8301, on behalf of decedent's wrongful death beneficiaries: Hope Amspacher, 25 Boundary Avenue, Red Lion, York County, Pennsylvania 17356, mother of Decedent and Administrator of Decedent's Estate.

4.      Decedent, Zachary Kirchner, did not bring an action for injuries during his lifetime.  No other action for wrongful death has been commenced. Amspacher claims all allowable damages, including loss of services, support, companionship, comfort, and contribution for and during the expected remainder of Decedent's life.

5.      Amspacher also brings a survival claim under 42 Pa.C.S. § 8302. Amspacher and the Estate claim all allowable damages, including pain and

2

suffering prior to death, and loss of past and future earnings, income, and earning capacity.

6.      Plaintiff Matthew Kirchner ("Plaintiff Kirchner") is an adult resident of York County, Pennsylvania.  At all relevant times, Plaintiff Kirchner was a minor child.

7.      Decedent was the younger brother of Plaintiff Kirchner.

## Defendants

8.      Defendant Red Lion Area School District (the "School District" or "Defendant School District") is a K-12 regional public school district that serves multiple boroughs and townships in York County, located at 696 Delta Road, Red Lion, York County, PA 17356.

9.      At all relevant times, Plaintiff Kirchner and Decedent were students within Defendant School District.

10.     At all relevant times, Defendant School District was a "public entity" within the meaning of 42 U.S.C. § 12131(1)(B).

11.     At all relevant times, Defendant School District was a recipient of federal funds within the meaning of Title IX.

12.     At all relevant times, Red Lion Area Junior High School ("JHS") was a public school within Defendant School District serving grades 7-8, located at 200 Country Club Road, Red Lion, York County, PA 17356.

13.     At all relevant times, Red Lion Area Senior High School ("SHS") was a public school within Defendant School District serving grades 9-12, located at 200 Horace Mann Avenue, Red Lion, York County, PA 17356.

14.     Jason M. Hoffman, M.A. ("Hoffman" or "Defendant Hoffman"), upon information and belief, is an adult resident of York County, Pennsylvania.

15.     At all relevant times, Defendant Hoffman was an adult employee of Defendant School District, working as a Counselor at SHS.

16.     Officer Marc Greenly ("Greenly" or "Officer Greenly"), upon information and belief, is an adult resident of York County, Pennsylvania.

17.     At all relevant times, Greenly was a police officer from 1993-2022 working for Red Lion Borough PD, York Area Regional PD, and/or York County Regional PD. Officer Greenly was School Resource Officer for the School District starting in 2005 through the dates relevant hereto.

18.     L.D., a minor ("L.D." or "Defendant L.D."), upon information and belief, is a minor resident of York County, Pennsylvania.

19.     D.M., a minor ("D.M." or "Defendant D.M."), upon information and belief, is a minor resident of York County, Pennsylvania.

20.     T.F., a minor ("T.F." or "Defendant T.F."), upon information and belief, is a minor resident of York County, Pennsylvania.

21.     C.H., a minor ("C.H." or "Defendant C.H."), upon information and belief, is a minor resident of York County, Pennsylvania.

22.     W.G., a minor ("W.G." or "Defendant W.G."), upon information and belief, is a minor resident of York County, Pennsylvania

23.     C.W., a minor ("C.W." or "Defendant C.W.") upon information and belief, is a minor resident of York County, Pennsylvania.

24.     L.D., D.M., T.F., C.H., W.G., and C.W. may be collectively referred to herein as "Student Defendants."

25.     At all relevant times, Student Defendants were students within Defendant School District.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over Counts I through VI pursuant to 28 U.S.C. § 1331, which gives United States District Courts jurisdiction over civil actions arising under the laws of the United States, including 42 U.S.C. § 1983, Title IX of the Educational Amendments of 1972 ("Title IX"), Title II of the Americans with Disabilities Act ("ADA"), Title V of the ADA, and Section 504 of the Rehabilitation Act ("RA").

27.     This Court also has jurisdiction over Counts VII through IX based upon supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  The laws of the Commonwealth of Pennsylvania apply to Counts VII through IX.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), since all parties reside in this District and the events giving rise to the claims occurred in this District.

## FACTS

### Background

29.     This case stems from the bullying of Decedent by Student Defendants, which resulted in Decedent taking his own life by suicide on April 20, 2021.

30.     Decedent was a student at JHS for 8th grade during the 2019-2020 school year and was a student at SHS for 9th grade during the 2020-2021 school year.

31.     Decedent was diagnosed with Autism Spectrum Disorder ("autism"), Attention Deficit Hyperactivity Disorder ("ADHD"), Anxiety, Oppositional Defiance Disorder ("ODD"), Obsessive Compulsive Disorder ("OCD"), and Mood Disorder Not Otherwise Specified.

32.     Due to Decedent's disabilities, Decedent was subject to an Individualized Educational Program ("IEP").

33.     At all relevant times, Decedent was a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2) of the ADA.

34.     Decedent had also come out as being gay during 8th grade.

35.     At all relevant times, Decedent was a protected class with respect to discrimination based on sexual orientation and gender identity under Title IX.

36.     Plaintiff Kirchner was also a student at SHS for 10th and 11th grade during the 2019-2020 and 2020-2021 school years, respectively.

37.     Thus, while Plaintiff Kirchner and Decedent attended different schools within Defendant School district for the 2019-2020 school year, Plaintiff Kirchner and Decedent both attended SHS within Defendant School District during the 2020-2021 school year.

38.     Decedent was a special education student within Defendant School District due to his disabilities.

## Relentless Bullying by Student Defendants

39.     Soon after Decedent came out as being gay during his 8th grade year, Student Defendants preyed on Decedent as a target of bullying.

40.     Student Defendants bullied Decedent routinely calling him "gay," "faggot," "gay boy," and other verbally abusive, demeaning, humiliating, and derogatory terms based on Decedent's sexual orientation and perceived effeminacy

41.     At one time, for example, during class time in 8th grade, Defendant W.G. went up to Decedent with a lollipop making sexual gestures and making gay jokes such as "I got a lollipop for you."

42.     In another example, Defendants L.D., D.M., and T.F. repeatedly called Decedent "faggot."

43.      Defendants L.D., D.M., T.F., and C.W. also told Decedent to kill himself over text message or other messaging services and made similar posts on social media for Decedent and other classmates to see.

44.     As early as 8th grade, Decedent made it known to his bullies that he was going to commit suicide, and even said that he would do so on a specific date: April 20.

45.     Still, Student Defendants publicly humiliated Decedent for his disabilities and how he acted differently from other children.

46.     Student Defendants intentionally provoked him to react explosively and emotionally due to his disabilities.

47.     Student Defendants were recklessly indifferent to Decedent's suicide risk, by directly taunting Decedent to kill himself.

48.     Student Defendants relentlessly harassed, belittled, and broke down Decedent by telling him to "kill yourself" and/or for Decedent to do a "charity" for Student Defendants by committing suicide.

49.     Student Defendants' sexual harassment and taunts for Decedent to kill himself continued and even increased as the children entered 9th grade at SHS.

50.     Defendant School District had actual notice of Decedent's incessant bullying due to his sexual orientation and Decedent's disability

51.     For example, "Zach is a fag" was scratched in large letters into a SHS bathroom stall door and remained thereon even after Decedent's death:



52.     Appropriate officials with the authority and ability to take corrective measures either saw, or were made aware, of the image above.

53.     Other times, Decedent would report the abuse to his teachers and school officials but they would not help him.

54.     Due to the bullying and abuse, Decedent began to exhibit self-harming behaviors including using knives to cut himself.

55.     In or about December of 2020, during Decedent's 9th grade year, Decedent attempted suicide for the first time by drinking nail polish remover.

56.     Decedent was hospitalized for multiple days.

57.     Defendant School District had actual knowledge of Decedent's first suicide attempt.

58.     After that suicide attempt, the relentless bullying by Student Defendants only continued.

59.     Decedent was not the only victim.

60.     Plaintiff Kirchner watched his brother's psychological torture in real time while they were both students in the School District.

61.     Plaintiff Kirchner witnessed the bullying of his brother and saw the visible decline in Decedent's mental health due to the psychological abuse.

62.     Plaintiff Kirchner repeatedly voiced his concerns to Defendant School District, however, they never intervened.

63.     For example, when Plaintiff Kirchner reported Decedent's abuse to schoolteachers and/or officials Mr. Rickard and Mark Shue and asked for them to intervene.

64.    One day Plaintiff Kirchner went to Mr. Rickard and Mr. Shue to tell them about a group of kids (including Student Defendants) who were calling Zachary a faggot; they told Plaintiff Kirchner to mind his own business.

65.    Plaintiff Kirchner felt helpless in trying to make the abuse and bullying stop given the apparent indifference of the School District and its officials.

66.    Mark Shue was, at all relevant times, the Principal of SHS.

67.    Mr. Rickard was, at all times relevant, the Assistant Principal of SHS.

**Conduct of Defendant School District Relating to Abuse**

68.    Due to the bullying, abuse, and sexual harassment of Decedent during school hours and on Defendant School District property, and as a result of Decedent's disabilities, Decedent exhibited disruptive and distressing behavior.

69.    Decedent's outbursts were the product of the bullying endured by Decedent and were exacerbated by his diagnosis of autism.

70.    Instead of protecting Decedent, however, Defendant School District responded by disciplining Decedent for conflict with his bullies and for reacting emotionally to this abuse.

71.    Each time Amspacher and/or Plaintiff Kirchner communicated to the School District that Decedent's behavior was the direct result of provocation by his peers, Defendant School District did nothing to intervene to stop the abuse.

72.     Thus, Defendant School District was undeniably aware of what was going on, had ample notice of what was happening to Decedent, and had ample opportunity to remedy the harassment and prevent it from continuing.

73.     This includes School District officials with authority to take corrective action, including Shue, the SHS Principal.

74.     In fact, Defendant School District took direct action in retaliation against Decedent, exacerbating the effects of his abuse by Student Defendants and his struggles due to his disabilities within SHS.

75.     On one occasion, an SHS teacher locking Decedent in a classroom against his will for an extended period of time.

76.     On another occasion, a SHS teacher forced Decedent to "reset" by sitting him amongst a circle of his classmates while they went around the room telling Decedent all of the things they did not like about him, including some and/or al Student Defendants.

77.     On other occasions, Ms. Carol Gilman, the parent of Defendant W.G., who teased and humiliated Decedent in front of his classmates for being effeminate and not athletic only perpetuated the abuse.

78.     Instead of acting against the students, including Student Defendants, who were harassing and bullying Decedent, the School District further emboldened and empowered those students by punishing Decedent.

79.     In doing so, Defendant School District created a toxic, hostile,
dangerous, and harmful school environment for Decedent, which directly led to
Decedent's suicide.

80.     Upon information and belief, Defendant School District was fully
aware of the prevalence of bullying and/or harassment within its schools and
maintained a spreadsheet tracking such information.

**Conduct of Defendant School District relating to Decedent's Disabilities**

81.     As explained above, Decedent suffered from diagnosed autism and
other disabilities making him a qualified individual for accommodations under the
ADA.

82.     The School District had actual awareness of Decedent's disabilities.

83.     Despite Decedent's disabilities, Defendant School District failed to
provide Decedent with reasonable accommodations in that (1) the District did not
respond adequately to Decedent's disability based bullying, and (2) the District did
not make reasonable accommodations to address the bullying.

84.     More specifically, Defendant School District failed to provide
reasonable and necessary accommodations for Decedent's diagnosis of autism.

85.     Amspacher repeatedly communicated to Defendant School District
her concerns that Decedent's Individualized Education Plan ("IEP") was
insufficient.

13

86.     The School District's failure to appropriately change Decedent's IEP was a cause of Decedent's continued disability-based bullying.

87.     Defendant School District failed to take any action.

88.     Due to the repeated failures of Defendant School District to provide accommodations to Decedent, Decedent's school attendance, grades, and participation sharply declined.

89.     As such, Decedent was deprived of the ability to receive an education on par with those students within Defendant School District who were not disabled.

90.     The District's failure to accommodate Decedent was the cause of his continued severe disability-based bullying and eventual suicide.

**Decedent's Suicide**

91.     Leading up to Decedent's suicide, he increasingly communicated his suicidal ideations to his classmates, including Student Defendants.

92.     For example, on April 13, 2021, Decedent sent a text message to a classmate at 9:19 A.M. stating "I'm fucking done with life."

93.     On or about April 19, 2021, Student Defendants continued to harass, make fun of, and bully Decedent and encouraged Decedent to kill himself.

94.     Decedent made posts on social media, including on Snapchat, between the evening of April 19, 2021, and the morning of April 20, 2021, expressing suicidal ideations.

95.     Student Defendants saw Decedent's suicidal social media posts.

96.     Student Defendants continued to bully Decedent and told him to kill himself despite having seen Decedent's suicidal intent shared on social media.

97.     Early in the morning of April 20, 2021, Amspacher left for work and Plaintiff Kirchner left for school, while Decedent remained in the home.

98.     Amspacher sent multiple text messages to her son that she was concerned about him, and that he needed to go to school.

99.     At 9:20 A.M., Decedent sent his last text message, to his mother (Amspacher), saying "leaving now."

100.   Decedent, was not, in fact, leaving for school.

101.   Decedent never showed up to school that day.

102.   Concerned about her son, Amspacher called SHS and asked that the School Resource Officer conduct a welfare check on Decedent, as she was concerned for Decedent's safety.

103.   Specifically, Amspacher notified the school that she was extremely concerned that Decedent harmed himself.

104.   By this time, students within SHS were talking openly about the fact that Decedent may have harmed himself or committed suicide that morning.

105.   Amspacher texted Plaintiff Kirchner and told him to go to the school office.

106.   Defendant School District and Defendant Hoffman knew Decedent was repeatedly bullied and harassed, including by Student Defendants.

107.   Decedent was a disabled student with a known history of autism, ADHD, anxiety, ODD, OCD and mood disorder, as well as self-harming behaviors, and suicidal ideations, and reactive disruptive behavior because of his bullying.

108.   Thus, Defendant School District and Defendant Hoffman were fully aware that Decedent was at significant risk of harming himself on the day of Decedent's suicide

109.   The School Resource Officer, Defendant Officer Greenly from the then-named York Area Regional Police Department ("YARPD"), and Defendant Hoffman wanted Plaintiff Kirchner to accompany them to his residence to check on Decedent.

110.   After leaving Plaintiff Kirchner's morning Chemistry class, Officer Greenly and Defendant Hoffman transported Plaintiff Kirchner, by vehicle, back to his house to check on Decedent.

111.   Greenly drove Plaintiff Kirchner and Defendant Hoffman in a police vehicle from SHS to the house.

112.   Defendant Hoffman and Officer Greenly directed Plaintiff Kirchner to unlock the front door.

113.   Instead of performing a welfare check despite repeated requests by Plaintiff Amspacher to do so, the adults directed Plaintiff Kirchner, a then-minor child, to search for his brother in the house.

114.   Plaintiff Amspacher begged Defendant Hoffman and Officer Greenly not to have Plaintiff Kirchner enter the house to look for his brother as she feared what Plaintiff Kirchner might find.

115.   Despite Amspacher's pleas, Officer Greenly and Defendant Hoffman stood in the living room area of the home just chatting and petting the dog while Plaintiff Kirchner went upstairs to Decedent's bedroom.

116.   Officer Greenly and Defendant Hoffman could hear Decedent's cell phone making noises somewhere in the house, but they still did not leave the main living area to search for Decedent.

117.   Plaintiff Kirchner found blood on the floors of the house and all over Decedent's bedroom, as well as a large kitchen knife.

118.   Plaintiff Kirchner came down from the second floor and proceeded through the living room and kitchen, past the two adults, and into the basement.

119.   Plaintiff Kirchner walked down the basement stairs and found his brother, Decedent, hanging from the ceiling rafter with a noose around his neck and self-inflicted knife wounds on his arm.

120.   Plaintiff Kirchner immediately began screaming at the sight of his little brother hanging from the ceiling and frantically tried to lift Decedent's lifeless body up to remove Decedent from his noose.

121.   It was only then that Defendant Hoffman and Officer Greenly ran down the basement stairs to help Plaintiff Kirchner take his brother down.

122.   Officer Greenly carried Decedent's lifeless body up the stairs and laid him on the kitchen floor.

123.   After some time, Officer Greenly covered Decedent's body with a blanket as he remained on the kitchen floor.

124.   Since witnessing Decedent's gruesome death, Plaintiff Kirchner has suffered extreme distress and his mental health severely declined.

### Continuing Conduct of Student Defendants

125.   On or about April 20, 2022, the one-year anniversary of Decedent's death, Defendant C.H. circulated a photograph on social media of Decedent's previous yearbook photo with a piece of rope placed around Decedent's neck like a noose.

126.   Upon information and belief, Defendant C.H. added a caption to the photo, which states "Can't believe 1 year, rope still aint break" with a flexing arm emoji and a smiling face emoji wearing sunglasses:



127.   This photograph was then reposted on social media multiple times by Student Defendants, mocking Decedent's death with humiliating comments like "Bro my homie just sent me dis lmao" with a crying laughing face emoji and "Now we gon change your way of thinking for good."

128.   Plaintiff Kirchner received this horrific photograph vis-a-vis the Student Defendants mocking his little brother's suicide on the anniversary of his death.

129.   Thus, Plaintiff Kirchner's witnessing and experience of the cruel bullying of Decedent by Student Defendants continued even after Decedent's tragic death, which further caused Plaintiff Kirchner to suffer severe emotional distress which has manifested in a variety of ways.

130.   Due to his severe mental distress, Plaintiff Kirchner dropped out of SHS in his senior year and did not graduate.

131.   As a direct and proximate result of Defendants' actions, Plaintiff Kirchner suffered severe mental and emotional distress including but not limited to extreme mental and emotional anguish, distress, and related physical trauma, causing severe depression, post-traumatic stress symptoms, frequent nightmares, anger, stress, and anxiety, intense headaches, upset stomach, and inability to sleep.

132.   As a direct and proximate result of Defendants' actions, Decedent suffered severe mental and emotional distress, deprivation of educational opportunities, and eventually death by suicide.

## COUNT I
**Violation of 42 U.S.C. § 1983 for State Created Danger**
***Plaintiff Matthew Kirchner v. Defendant Hoffman, in his individual and official capacity, and Defendant Greenly, in his individual and official capacity***

133.   The allegations throughout this Complaint are incorporated as if set forth fully herein.

134.   Plaintiff Kirchner was deprived of a constitutionally protected right by the conduct of a person acting under color of state law.

135.   Namely, Plaintiff Kirchner was deprived of his constitutionally protected right of right to be free from unjustified intrusion upon Plaintiff's physical and emotional well-being.

136.   The right Plaintiff Kirchner was deprived of was clearly established as of April 2021.

137.   It was clearly established that state actors may not bring a private citizen into a dangerous situation, where state actors are aware of the risk of serious harm and are responsible for creating the opportunity for that harm to happen.

138.   Likewise, reckless, conscience shocking conduct that alters the status quo and places a child at substantial risk of serious, immediate, and proximate harm is unconstitutional; again, this idea was clearly established by 2021.

139.   The harm ultimately caused to Plaintiff Kirchner was foreseeable and fairly direct.

140.   As explained fully herein, Decedent was a disabled student with a known history of self-harming behaviors, and suicidal ideations, and reactive disruptive behavior as a result of provocation by his peers and was at significant risk of harming himself.

141.   Defendants were aware of this risk and the likelihood Decedent had harmed himself that day.

142.   Despite these known risks, Defendants transported Plaintiff Kirchner, then a minor child, off the SHS campus to his home, against the pleas of his mother, Amspacher, where Plaintiff Kirchner found his deceased younger brother covered in blood, lacerations, and hanging from a noose in his basement.

143.   Defendants, as state actors, acted with a degree of culpability that shocks the conscience.

144.   Plaintiff was a foreseeable victim of Defendants actions.

145.   Defendants affirmatively used their authority in a way that created a danger to Plaintiff Kirchner and/or that rendered Plaintiff Kirchner, a minor child, more vulnerable to danger than had the state not acted at all.

146.   Defendants acted in an affirmative way that resulted in a drastic change to the status quo (Plaintiff Kirchner being at school and not witnessing his brother's death).

147. By removing Plaintiff Kirchner from SHS, Defendants took responsibility for Plaintiff's wellbeing, and thereafter abandoned it by allowing Plaintiff Kirchner to find his brother's lifeless body.

WHEREFORE, Plaintiff Kirchner requests damages against Defendants jointly and severally, including attorneys' fees, costs, pre and post judgment interest, and any other such other relief as this Honorable Court deems appropriate.

## COUNT II
### Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.* for Sexual Harassment
### *Decedent v. Defendant School District*

148. The allegations throughout this Complaint are incorporated as if set forth fully herein.

149. At all relevant times, Defendant School District is a recipient of federal funds within the meaning of Title IX.

150. Decedent endured years of sexual harassment based upon his sexual orientation and gender identity while attending school within Defendant School District.

151. Actual notice of the sexual harassment and abuse of Decedent was received by appropriate persons within Defendant School District, namely, the principal, vice principal, counselor, school resource officer, and other teachers within Defendant School District.

152.   Defendant School District responded to Decedent's abuse with deliberate indifference.

153.   Due to Defendant School District's deliberate indifference to known acts of sexual harassment, bullying, and abuse of Decedent that was severe, pervasive, and objectively offensive, Defendant School District barred Decedent's access to educational opportunity and educational benefits in violation of Title IX.

154.   Due to Defendant School District's actions and/or inactions, Decedent suffered damages.

WHEREFORE, Amspacher, on behalf of herself and the Estate, requests damages against Defendant School District, jointly and severally, including attorneys' fees, costs, pre and post judgment interest, compensatory damages, and any other such other relief as this Honorable Court deems appropriate.

## COUNT III
### Violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 for Discrimination
### *Decedent v. Defendant School District*

155.   The allegations throughout this Complaint are incorporated as if set forth fully herein.

156.   At all relevant times, Decedent was a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2) of the ADA.

157.   More specifically, Decedent was diagnosed with autism which is a qualified disability under the ADA.

158.   Decedent was otherwise qualified to participate in a school program at Defendant School District.

159.   As a result of Defendant school District's failure to provide Decedent with reasonable and necessary accommodations for his disabilities, Decedent was denied participation in and the benefits of the school program and his education.

160.   Due to Defendant School District's actions and/or inactions, Decedent suffered damages.

WHEREFORE, Amspacher, on behalf of herself and the Estate, requests damages against Defendant School District, jointly and severally, including attorneys' fees, costs, pre and post judgment interest, compensatory damages, and any other such other relief as this Honorable Court deems appropriate.

## COUNT IV
### Violation of § 504 of the Rehabilitation Act for Discrimination
### *Decedent v. Defendant School District*

161.   The allegations throughout this Complaint are incorporated as if set forth fully herein.

162.   At all relevant times, Decedent was a "qualified individual with a disability" as enumerated above.

163.   More specifically, Decedent was diagnosed with autism which is a qualified disability.

164.   Decedent was otherwise qualified to participate in a school program at Defendant School District

165.   As a result of Defendant school District's failure to provide Decedent with reasonable and necessary accommodations for his disabilities, Decedent was denied participation in and the benefits of the school program and his education.

166.   Due to Defendant School District's actions and/or inactions, Decedent suffered damages.

WHEREFORE, Amspacher, on behalf of herself and the Estate, requests damages against Defendant School District, jointly and severally, including attorneys' fees, costs, pre and post judgment interest, compensatory damages, and any other such other relief as this Honorable Court deems appropriate.

## COUNT V
### Gross Negligence and/or Recklessness
### *Estate v. Student Defendants*

167.   The allegations throughout this Complaint are incorporated as if set forth fully herein.

168.   Student Defendants bullied and abused Decedent, including due to his sexual orientation and disabilities, and repeatedly demanded that Decedent kill

himself, even after knowing that Decedent had previously tried to do so, as enumerated at length herein.

169.   Student Defendants intended to commit the acts in question in reckless disregard for the reality that it would cause a risk of harm.

170.   Student Defendants did not necessarily intend to cause the harm to Decedent that resulted from their actions, namely, the death of Decedent, but were recklessly indifferent to the risk of that harm.

171.   Student Defendants, however, should have known or realized that there was a strong probability that harm to Decedent might result, even if they expected that their conduct would prove harmless.

172.   Student Defendants acted outrageously with reckless indifference to the rights of Decedent.

173.   Due to the reckless actions of Student Defendants, Decedent took his own life by suicide.

WHEREFORE, Amspacher, on behalf of herself and the Estate, requests damages against Student Defendants, jointly and severally, including attorneys' fees, costs, pre and post judgment interest, compensatory damages, punitive damages, and any other such other relief as this Honorable Court deems appropriate.

## **COUNT VI**

**Intentional Infliction of Emotional Distress**
***Plaintiff Kirchner v. Student Defendants***

174.   The allegations throughout this Complaint are incorporated as if set forth fully herein.

175.   Student Defendants' conduct as enumerated at length herein was extreme or outrageous, and utterly intolerable in a civilized community.

176.   Student Defendants' conduct as enumerated at length herein was reckless.

177.   As a direct result of Student Defendants' conduct, Decedent suffered severe emotional distress as enumerated at length herein.

WHEREFORE, Plaintiff Kirchner requests damages against Student Defendants, jointly and severally, including attorneys' fees, costs, pre and post judgment interest, compensatory damages, punitive damages, and any other such other relief as this Honorable Court deems appropriate.

**COUNT IX**
**Intentional Infliction of Emotional Distress**
***Estate v. Student Defendants***

178.   The allegations throughout this Complaint are incorporated as if set forth fully herein.

179.   Student Defendants' conduct as enumerated at length herein was extreme or outrageous, and utterly intolerable in a civilized community.

28

180.   Student Defendants' conduct as enumerated at length herein was intentional and/or reckless.

181.   As a direct result of Student Defendants' conduct, Decedent suffered severe emotional distress, so much so that he took his own life, as enumerated at length herein.

WHEREFORE, Amspacher, on behalf of herself and the Estate, requests damages against Student Defendants, jointly and severally, including attorneys' fees, costs, pre and post judgment interest, compensatory damages, punitive damages, and any other such other relief as this Honorable Court deems appropriate.

Respectfully Submitted,
**ANDREOZZI + FOOTE**

Dated: February 17, 2023

*/s/ Nathaniel L. Foote*
Nathaniel L. Foote, Esq. (PA #318998)
nate@vca.law

*/s/ Renee Franchi*
Renee Franchi, Esq. (PA #313950)
renee@vca.law

4503 North Front Street
Harrisburg, PA 17110
Ph: 717.525.9124 | Fax: 717.525.9143
*Attorneys for Plaintiff*