**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HOPE AMSPACHER, *Administrator of the Estate of Zachary Kirchner*, and MATTHEW KIRCHNER, | : : : : | Civil No. 1:23-CV-00286 |
| Plaintiffs, | : : | |
| v. | : : | |
| RED LION AREA SCHOOL DISTRICT, *et al.*, | : : : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

The life of Zachary Kirchner ("Zachary" or "Decedent") was cut short on April 20, 2021, when the ninth grader took his own life.  While suicide sometimes happens with no warning, that was not the case with Zachary.  He gave multiple conspicuous indications of his distress and consequent tendency towards self-harm.  Plaintiffs allege that these indications did nothing to reduce or slow the torrent of abuse and bullying that he was subjected to by several of his classmates, Defendants L.D., D.M., T.F., C.H., W.G., and C.A. (collectively, "Student Defendants").  Nor did Zachary's distress, or the abuse he faced, lead the school district to shield him from harassment.  The circumstances leading to Zachary's tragic death and his brother's subsequent discovery of his lifeless body form the basis of this legal action.

1

Before the court are four motions, filed by Defendants Officer Marc Greenly ("Officer Greenly"), T.F., W.G., and L.D. (collectively with Officer Greenly, the "Moving Defendants"), to dismiss claims in Plaintiffs' amended complaint. (Docs. 23, 26, 29, 35.) For the reasons that follow, the court will grant in part and deny in part the motions.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

As alleged in the amended complaint, this case arises from Student Defendants bullying their classmate, Zachary. (Doc. 18, ¶¶ 18–25, 29.) At all relevant times, Zachary and Student Defendants, all of whom were minors, were students within Defendant Red Lion Area School District (the "School District"). (*Id.* ¶¶ 9, 11–12, 25.) So was Zachary's older brother, Plaintiff Matthew Kirchner ("Matthew"). (*Id.* ¶¶ 6–7, 9.) Zachary attended junior high school for the 2019–2020 term and senior high school for the 2020–2021 term. (*Id.* ¶¶ 12–13, 30.) He had multiple diagnoses, including autism spectrum disorder ("autism"), attention deficit hyperactivity disorder ("ADHD"), anxiety, oppositional defiance disorder ("ODD"), obsessive compulsive disorder ("OCD"), and mood disorder not otherwise specified. (*Id.* ¶ 31.)

---

[1] The facts in this section are taken from the operative complaint. (Doc. 18.) For purposes of this motion to dismiss, the court accepts these facts, per the applicable legal standard.

Some or all of these diagnoses were considered disabilities.  (*Id.* ¶ 32.)  Due to his disabilities, Zachary was a special education student within the School District and had an Individualized Educational Program ("IEP").  (*Id.* ¶¶ 32, 38.)

While in the eighth grade, Zachary came out as being gay.  (*Id.* ¶ 39.)  Soon thereafter, Student Defendants began harassing him routinely.  (*Id.*)  They called him "gay," "faggot," "gay boy," and other "demeaning, humiliating, and derogatory terms based on" his sexual orientation.  (*Id.* ¶ 40.)  More specifically, while in eighth grade, W.G. approached Zachary where he made "sexual gestures" with a lollipop and "gay jokes," like "I got a lollipop for you."  (*Id.* ¶ 41.)  At unspecified times, L.D., D.M., and T.F. repeatedly called Zachary "faggot."  (*Id.* ¶ 42.)  And L.D., D.M., T.F., and C.A. told Zachary to kill himself via text message and social media posts both private and public.  (*Id.* ¶ 43.)

Zachary was not private about his suicidal thoughts.  In eighth grade, he told Student Defendants that he would commit suicide and intended to do so on April 20.  (*Id.* ¶ 44.)  Student Defendants continued to publicly humiliate Zachary for his disabilities and "how he acted differently from other children."  (*Id.* ¶ 45.)  They told him to kill himself and that committing suicide would be an act of charity.  (*Id.* ¶ 48.)  This harassment regarding sexual orientation and suicide continued and increased in the ninth grade.  (*Id.* ¶ 49.)

The School District was aware of this bullying.  (*Id.* ¶¶ 50–53.)  Zachary reported the harassment to "his teachers and [other] school officials but they would not help him."  (*Id.* ¶ 53.)  School District officials were also aware of graffiti in a school bathroom stall, which read "Zach is a fag," and which remained there even after Zachary's death.  (*Id.* ¶ 51.)

Zachary exhibited self-harming behavior, which included cutting himself with knives.  (*Id.* ¶ 54.)  In or around December 2020, Zachary first attempted suicide and was consequently hospitalized for multiple days.  (*Id.* ¶¶ 55–56.)  The School District was aware of this incident.  (*Id.* ¶ 57.)  Student Defendants continued to bully Zachary thereafter.  (*Id.* ¶ 58.)

Matthew was concerned about the bullying as well as Zachary's resulting decline in mental health.  (*Id.* ¶ 61.)  Matthew expressed his concerns to the School District, but they did not intervene.  (*Id.* ¶ 62.)  In one instance, Matthew approached Principal Rickard and Assistant Principal Shue of the senior high school and told them that a group of students was calling Zachary a faggot.  (*Id.* ¶ 64.)  They told Matthew to mind his own business.  (*Id.*)

Zachary exhibited "disruptive and distressing behavior," which was caused by the bullying and exacerbated by Zachary's autism.  (*Id.* ¶¶ 68–69.)  Despite being aware of the extensive harassment Zachary was subjected to by Student Defendants, the School District at no time intervened.  (*Id.* ¶ 71–72.)  Rather than

protecting Zachary or disciplining Student Defendants, the School District allegedly responded by disciplining Zachary. (*Id.* ¶ 70.) On one occasion, a teacher allegedly locked Zachary in a classroom "against his will for an extended period of time." (*Id.* ¶ 75.) In another instance, a teacher had Zachary sit in a circle of his classmates while his classmates took turn telling him "all of the things they did not like about him." (*Id.* ¶ 76.)

Plaintiffs assert that, by punishing Zachary instead of Student Defendants, the School District "created a toxic, hostile, dangerous, and harmful school environment" for Zachary. (*Id.* ¶ 79.) Plaintiffs allege that this environment directly led to Zachary's suicide. (*Id.*)

Following Zachary's December 2020 suicide attempt, he increasingly expressed his suicidal thoughts to classmates including Student Defendants. (*Id.* ¶ 91.) Sometimes, he expressed these thoughts over text message and social media, as he did during the weeks of April 13 and 20, 2021. (*Id.* ¶¶ 93–94.) In response to Zachary's social media posts on April 19, 2021 and the morning of April 20, 2021, Student Defendants told Zachary to kill himself. (*Id.* ¶¶ 94–96.)

On the morning of April 20, 2021, Hope Amspacher ("Amspacher"), the mother of Matthew and Zachary, left for work while Zachary was home. (*Id.* ¶ 97.) Amspacher told Zachary via multiple texts that she was concerned about

him and that he had to go to school. (*Id.* ¶ 98.) At 9:20 a.m., Zachary texted Amspacher that he was leaving for school. (*Id.* ¶ 99.)

Zachary never arrived at school and sent no more messages to Amspacher. (*Id.* ¶¶ 100–102.) Amspacher was concerned that Zachary had harmed himself, and she expressed that concern to the School District. (*Id.* ¶ 103.) At that point, high school students were "talking openly about the fact that [Zachary] may have harmed himself or committed suicide that morning." (*Id.* ¶ 104.)

Amspacher texted Matthew to tell him to go to the school office. (*Id.* ¶ 105.) Officer Greenly and Defendant Jason M. Hoffman ("Hoffman") left the school to check on Zachary. (*Id.* ¶¶ 108–09.) They took Matthew along with them. (*Id.* ¶ 109.) Amspacher repeatedly requested that Hoffman and Officer Greenly conduct a welfare check and not have Matthew enter the home. (*Id.* ¶¶ 112–14.)

Despite Amspacher's requests, Officer Greenly and Hoffman instructed Matthew, then a minor, to search the house for his brother. (*Id.*) While Matthew searched, Officer Greenly and Hoffman waited in the living room. (*Id.* ¶ 115.) Upstairs, Matthew discovered blood on the floor and through Zachary's bedroom. (*Id.* ¶ 117.) Officer Greenly and Hoffman did not accompany Matthew for that discovery. (*Id.* ¶ 115–121.) Nor did they accompany Matthew when he came downstairs, passed them in the living room, and proceeded to the basement. (*Id.*) Matthew went downstairs, discovered Zachary hanging by a noose from the

basement ceiling with his arm covered in knife wounds, and began screaming.

(*Id.*)  It was only then that Officer Greenly and Hoffman came downstairs to help.

(*Id.*)  Since discovering Zachary's body, Matthew has suffered extreme distress

and his mental health has severely declined.  (*Id.* ¶ 124.)

　　　　The initial complaint in this case was filed on February 17, 2023.  (Doc. 1.)

The amended complaint was filed on April 19, 2023 by Amspacher and Matthew.

(Doc. 18, ¶¶ 1, 6.)  Amspacher brings her claims on behalf of Zachary and as

administratrix of his estate (the "Estate"), having been granted the necessary

approvals by the York County Register of Wills.  (*Id.* ¶ 5.)

　　　　The claims that are subject to the instant motions to dismiss are as follows.

In Count I, Matthew brings a claim for state created danger, in violation of 42

U.S.C. § 1983, against Officer Greenly in his individual and official capacity.[2]

(*Id.* ¶¶ 133–147.)  In Count V, the Estate brings a claim of gross negligence or

recklessness against the Student Defendants.  (*Id.* ¶¶ 167–173.)  In Count VI,

Mathew brings a claim of intentional infliction of emotional distress ("IIED")

against the Student Defendants.  (*Id.* ¶¶ 174–177.)  And in Count VII, the Estate

brings an IIED claim against the Student Defendants.[3]  (*Id.* ¶¶ 178–181.)

---

[2] Matthew also brings this claim against Hoffman.  (Doc. 18, ¶¶ 14, 133–147.)  Officer Greenly is the only movant with respect to Count I.  Therefore, the court includes in this memorandum only those facts that relate to Officer Greenly and omits those facts related to Hoffman.

[3] The amended complaint labels this claim as Count IX, but the court perceives that as a numbering error and instead refers to it as Count VII.

On May 2, 2023, Officer Greenly filed a motion to dismiss the claim against him.  (Doc. 23.)  T.F. and W.G. filed motions to dismiss on May 3, 2023.  (Docs. 26, 27.)  And then L.D. filed a motion to dismiss on May 22, 2023.  (Doc. 35.)  The Moving Defendants filed briefs in support, Plaintiffs filed a consolidated brief in opposition, and W.G. and T.F. filed reply briefs.  (Docs. 24, 33, 34, 36, 41, 43, 44.)  The motions to dismiss are ripe for review.

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

## DISCUSSION

Officer Greenly argues that the state created danger claim raised against him fails to state a claim for which relief may be granted under Rule 12(b)(6).  In the alternative, he argues that the claim against him should be severed.  T.F., L.D., and W.G. argue that the claims against them fail under Rule 12(b)(6).  The court addresses their arguments below.

### A. The court will dismiss Matthew's state created danger claim against Officer Greenly because Matthew has failed to show that qualified immunity does not apply.

Matthew raises a claim of state created danger against Officer Greenly. Officer Greenly argues that qualified immunity bars this claim.  (Doc. 24, pp. 6–8.) Officer Greenly also argues that Matthew's allegations do not establish the elements of state created danger.  (*Id.* at 4–6.)  Specifically, he asserts that Matthew fails to plead that Officer Greenly acted with the requisite culpability or rendered Matthew more vulnerable to danger.  (*Id.*)

The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Qualified

immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Because qualified immunity is an "immunity from suit rather than a mere defense to liability," the Supreme Court has repeatedly instructed that it should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted).

To overcome qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  In analyzing the facts, the court has discretion to decide which of the prongs to address first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is "clearly established" for qualified immunity purposes only if "the contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1982).  Thus, defendants are entitled to qualified immunity if "reasonable officials in [their] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful."  *In*

*re City of Phila. Litig.*, 49 F.3d 945, 961 n.14 (3d Cir. 1995).  However, for reasonable officials to be on notice that their conduct would be unlawful, there need not be "a previous precedent directly on point."  *Acierno v. Cloutier*, 40 F.3d 597, 620 (3d Cir. 1994); *accord Anderson*, 483 U.S. at 640 (holding that the "clearly established" standard does not require that "the very action in question has previously been held unlawful").  Rather, there need only be "some but not precise factual correspondence between relevant precedents and the conduct at issue," *Pro v. Donatucci*, 81 F.3d 1283, 1292 (3d Cir. 1996) (internal citations and quotations omitted), so that "in the light of pre-existing law the unlawfulness [would be] apparent."  *Anderson*, 483 U.S. at 640.

Officer Greenly argues that qualified immunity applies to the claim against him because Matthew has not pleaded that any constitutional violation occurred, let alone a violation that was clearly established.  (Doc. 24, pp. 6–8.)  The amended complaint only asserts that Matthew was "deprived of his constitutionally protected right of right [sic] to be free from unjustified intrusion upon Plaintiff's physical and emotional well-being."  (*Id.* at 7 (quoting Doc. 18, ¶ 135).)

Matthew responds that he had a constitutional right under the 14th Amendment to be free from unjustified intrusion upon his physical and emotional well-being pursuant to *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235 (3d Cir. 2016). (Doc. 41, pp. 39–40.)  As the Third Circuit found in *L.R.*, "[e]xposing a young

child to an obvious danger is the quintessential example of when qualified immunity should not shield a public official from suit."  (*Id.* at 40 (quoting *L.R.*, 836 F.3d at 250).)

In *L.R.*, the Third Circuit found that qualified immunity did not shield the teacher of a five-year-old child from a state-created danger claim.  836 F.3d at 239–40, 250.  The teacher had released the five-year-old, "Jane," to a stranger.  *Id.* The stranger took Jane from school and sexually assaulted her, which resulted in "significant physical and emotional injuries."  *Id.* at 239–40 & n.1.  In its opinion, the Third Circuit noted instances where other circuits have let cases proceed against officials for their conduct related to minors.  *Id.* at 249–50 (citing *White v. Rochford*, 592 F.2d 381, 386 (7th Cir. 1979) ("[Holding] that police officers who 'abandon children and leave them in health-endangering situations after having arrested their custodian and thereby deprive them of adult protection' violate the children's 'right to be free from unjustified intrusions upon physical and emotional well-being.'"); *Armijo ex rel. Chavez v. Wagon Mount Pub. Schs.*, 159 F.3d 1253 (10th Cir. 1998) (holding that qualified immunity did not bar claim brought against school officials by the parents of a special education student who committed suicide, "when school officials sent the student home after he was acting up in school, despite knowing that he was having suicidal thoughts, he had access to firearms in his house, and his parents were not home.")).

Matthew points out that *Armijo* was decided decades prior to Zachary's suicide. (Doc. 41, p. 42.) He further argues that, as with these cases, Officer Greenly unreasonably intruded upon his physical and emotional well-being. (*Id.*)

Matthew has not adequately pleaded that Officer Greenly violated a constitutionally or statutorily protected right of Matthew, let alone one that was clearly established, because the Third Circuit has not explicitly recognized a right of children to be free from unjustified intrusions upon physical and emotional well-being. The court in *L.R.* noted that the Seventh Circuit had recognized such a right. 836 F.3d at 249 (citation omitted). But the Third Circuit did not hold that this broadly-stated right is recognied in the Third Circuit. Rather, the holding in *L.R.* was narrow and fact-specific: in 2013, the teacher-defendant was "on notice that permitting a kindergarten student to leave his classroom with an unidentified adult could lead to a deprivation of that student's substantive due process rights." *Id.* at 250.

More importantly for this case, Matthew has not shown that there is a constitutional or statutory right to be free from unjustified intrusion upon emotional well-being absent physical harm. If such a right existed and were clearly established, the allegations in the amended complaint would likely be sufficient to overcome qualified immunity. The amended complaint asserts horrific circumstances in which Amspacher pleaded with Officer Greenly to not

make Matthew enter their home to search for Zachary.  (Doc. 18, ¶ 114.)  Because Officer Greenly would not go in search of Zachary, as Amspacher had requested, Matthew was forced to search for his borther.  As a result, the tenth grader was the one to discover his younger brother's bloody hanging body.  That incident plausibly caused substantial intrusion upon Matthew's emotional well-being.

However, Matthew has not presented any precedent to suggest that there is a constitutional or statutory right in the Third Circuit to be free from unjustified intrusion upon emotional well-being absent any physical harm.  Therefore, he fails to meet the first prong of qualified immunity as set forth in *al-Kidd*.  563 U.S. at 735.  Nor has he presented precedent showing that such a right is clearly established, as required by the second prong of *al-Kidd*.  Because Matthew has failed to identify a clearly protected right, Officer Greenly is entitled to qualified immunity.  The court will dismiss Count I with respect to Officer Greenly.

## B. Negligence

As the Pennsylvania Supreme Court has stated, "[t]o establish a *prima facie* case of negligence, a plaintiff must plead that 'the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury, and the plaintiff suffered an actual loss or damage."  *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 221 (Pa. 2018) (citation omitted).

T.F., L.D., and W.G. argue that the Estate's negligence claim fails because the Estate has failed to adequately plead that Student Defendants owed a duty of care to Zachary.  (Doc. 33, p. 9; Doc. 34, p. 9–13; Doc. 36, pp. 9–13.)  They point out that the amended complaint identifies no applicable duty of care.  L.D. and W.G. go further to argue that, under the applicable standard, Pennsylvania law would not support the finding of a new duty here.  (Doc. 34, pp. 9–13; Doc. 36, pp.11–13 (citing *Althaus v. Cohen*, 756 A.2d 1166 (2000)).)

W.G. also argues that the Estate's claim fails because it does not allege facts that demonstrate the element of causation.  (Doc. 34, pp. 13–15.)  Lastly, W.G. argues that this claim must be dismissed because it is brought as a "gross negligence and/or recklessness" claim, but these are not independent causes of action.  (*Id.* at 16–17.)  Instead, when a cause of action exists, recklessness and gross negligence may form the basis for punitive damages.  (*Id.*)

The court will begin by analyzing the arguments surrounding duty.  It is true that nowhere in the amended complaint does the Estate allege that Student Defendants owed a duty of care.  Nor does the Estate specify what duty of care would apply.  In its brief in opposition, the Estate argues that the Student Defendants owed Zachary a general duty not to expose others to reasonably foreseeable risks of injury.  (Doc. 41, pp. 24–25 (citing *Roche v. Ugly Duckling Car Sales, Inc.*, 879 A.2d 785 (Pa. Super. 2005)).)  Also, without asking this court

to find the existence of a new duty of care, the Estate does argue that such a duty could be established under Pennsylvania law.  (*Id.* at 26–27 (applying *Althaus*).)

Because the Estate has failed to plead a duty of care in the amended complaint, it cannot make out a prima facie claim.  Therefore, the court will dismiss Count V with respect to T.F., L.D., and W.G.[4]

### C. The court will grant in part and deny in part the dismissal of Plaintiffs' IIED claims.

To bring a claim of IIED, a plaintiff must show that "(1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that same was 'substantially certain' to occur." *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 439 (M.D. Pa. 2018) (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217–18 (3d Cir. 2001)).  The standard is difficult to satisfy, and "mere insults, indignities, threats, annoyances, petty oppressions, and other trivialities" are insufficient to sustain an IIED claim.  *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 542 (M.D. Pa. 2009) (quoting *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 310 (M.D. Pa. 1988)).

---

[4]  Because Count V fails on the element of duty, the court will not address W.G.'s additional arguments regarding causation and whether a "gross negligence and/or recklessness" claim can survive when not explicitly pleaded as a negligence cause of action.

Pennsylvania courts have found that the first element is met only for "the most egregious conduct."  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (citation omitted).  The conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Id.* (citation omitted).

T.F., L.D., and W.G. argue that Matthew cannot meet the first element. (Doc. 33, pp. 11–15; Doc. 34, pp. 18–19; Doc. 36, pp. 14–15.)  L.D. and W.G. also argue that, as a bystander, Matthew can only recover for allegedly outrageous conduct that occurred in his presence.  (Doc. 34, pp. 17, 19; Doc. 36, p. 14.)  They argue that, because no such conduct is alleged, his claim fails.  Lastly, W.G. argues that Matthew cannot meet the third element of knowledge or substantial certainty. (Doc. 34, pp. 19–20.)  As their arguments vary by Defendant and count, the court first addresses T.F.'s arguments and then addresses the arguments L.D. and W.G. raise regarding Counts VI and VII.

### 1.  The court will not dismiss the IIED claims brought against T.F.

T.F. argues that Counts VI and VII fail because Pennsylvania courts have held that bullying, insults, and taunting are insufficient to raise an IIED claim. (Doc. 33, pp. 11–14.)[5]  T.F. argues that the present instance is similar to *Price ex*

---

[5] T.F. also argues in passing that Matthew's claim fails because he does not allege physical manifestation as a result of the IIED.  (Doc. 33, p. 15.)  Despite minor typographical errors in

*rel. O.P. v. Scranton Sch. Dist.*, Civil Action No. 11–0095, 2012 WL 37090 (M.D. Pa. Jan. 6, 2012).

In *Price*, a seventh-grade girl brought claims including IIED against various defendants, including students.  2012 WL 37090, at *1.  After the girl contracted a yeast infection, classmates found out and began to tease and taunt her.  *Id.* at *2.  She was taunted multiple times a day, and the harassment increased to the point that she was regularly called a "bitch, a skank, a slut, a tramp, and a whore."  *Id.* (internal quotation marks omitted).  As a result of the conduct, the girl suffered from posttraumatic stress disorder and contemplated suicide on multiple occasions.  *Id.* at *4.  The court concluded that the girl's IIED claim against the students failed, because the student defendants' conduct did not reach the level of outrageous under Pennsylvania law.  *Id.* at *12.

T.F. argues that whether conduct qualifies as extreme and outrageous is greatly impacted by the identity of the defendant.  (Doc. 33, p. 13 (citing *Price*, 2012 WL 37090; *DiSalvio v. Lower Merion High Sch. Dis.*, 158 F. Supp. 2d 553 (E.D. Pa. 2001)).)  The court in *Price* found that distinction important.  *Price*, 2012 WL 37090, at *12 (dismissing IIED claim because, unlike in *DiSalvio* where

---

case name and reporter number, the court construes T.F. as citing *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987) to support this proposition.  But T.F. does not develop this argument, and *Kazatsky* does not support T.F.'s proposition on its face.  Therefore, the court will not address this argument further.

sexual harassment by a school employee involved differences in the parties' age and relative power, that dynamic was absent between classmates). T.F. argues that, because the defendants here are students, this case is like *Price* and unlike *DiSalvio*.

While T.F. is correct with respect to the importance of the identity of the defendants, the court is not convinced that the present instance is altogether similar to *Price*. Although the conduct of the student defendants in *Price* was hurtful, offensive, and inappropriate, it does not rise to the level of conduct alleged in this case. To being, the amended complaint alleges that T.F. repeatedly called Zachary a "faggot." (Doc. 18, ¶ 42.) That verbal abuse and bullying is similar to the conduct in *Price*. But here, T.F. also allegedly told Zachary "to kill himself over text message or other messaging services and made similar posts on social media for [Zachary] and other classmates to see." (*Id.* ¶ 43.) That is unlike any conduct at issue in *Price*. This allegation plausibly alleges outrageous conduct, especially considering Student Defendants' alleged awareness of Zachary's suicidal thoughts. (*Id.* ¶ 44.) Because the amended complaint plausibly alleges that T.F. engaged in outrageous conduct, T.F.'s arguments fail. Therefore, the court will deny T.F.'s motion to dismiss Counts VI and VII.

Because the court is not granting dismissal of the IIED claims against T.F., T.F. argues that the court should require Plaintiffs to plead additional facts

sufficient to satisfy the pleading requirements of Federal Rule of Civil Procedure 8. (Doc. 33, p. 15.)  T.F. presents no authority in support of this request, and instead relies entirely on argument.  (*Id.*)  T.F. argues that the amended complaint generalizes the allegations against all Student Defendants without specifying the "timing, method, manner, means or context" of T.F.'s alleged conduct.  (*Id.*)

Plaintiffs respond that, under Rule 8(a)(2), they are only required to make "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  To do so, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).  Plaintiffs argue that they have done so here.  (Doc. 41, p. 31.)  They have alleged that Student Defendants "each specifically contributed to Zachary's . . . suicide and Matthew's anguish."  (*Id.*)

The court concludes that Plaintiffs have pleaded claims against T.F. with sufficient specificity.  Plaintiffs have pleaded that T.F. repeatedly called Zachary derogatory slurs and urged him to kill himself over text message and public and private social media posts.  (Doc. 18, ¶¶ 42–43.)  T.F. is on notice of Plaintiffs' claims.  Therefore, the court will not require Plaintiffs to file additional pleadings with respect to T.F.

### 2. The court will dismiss Count VI with respect to W.G. and L.D. because Matthew has not adequately pleaded that he was present when the allegedly outrageous conduct occurred.

W.G. and L.D. argue that, under Pennsylvania law, Matthew has not adequately pleaded an IIED claim as a bystander.  (Doc. 34, pp. 17, 19–20; Doc. 35, pp. 14–15.)  When the IIED plaintiff is a bystander and not the direct recipient of the complained-of conduct, the Superior Court of Pennsylvania noted that it "has repeatedly indicated that the individual suffering the distress must be present when the outrageous conduct is directed at a third person." *Johnson v. Caparelli*, 625 A.2d 668, 672 (Pa. Super. Ct. 1993).

W.G. and L.D. argue that this requirement for Count VI is not pleaded in the amended complaint.  (Doc. 34, p. 19; Doc. 36, p. 15.)  Instead, it "fails to allege any interactions where [Matthew] was present during the alleged tortious activity by Defendant L.D."  (Doc. 36, p. 15.)  Similarly, Matthew has not alleged that he was present during any tortious conduct allegedly committed by W.G.  (Doc. 34, p. 19.)[6]  W.G. and L.D. argue that, under *Johnson v. Caparelli*, 625 A.2d 668 (Pa. Super. Ct. 1993), his lack of presence bars him from recovery.  (Doc. 34, pp. 17, 19–20; Doc. 36, pp. 14–15.)

---

[6] W.G. also asserts that, during Zachary's eight grade year, Matthew was in high school in an entirely different building when any allegedly tortious conduct occurred.  (Doc. 34, p. 19.)  Because these facts are not presented in the amended complaint, the court will not consider them for the purposes of the instant motions to dismiss.

Plaintiffs do not address this argument.  Therefore, the court infers that Matthew has conceded this issue.  In light of *Johnson*, Matthew has not met the pleading standard with respect to his IIED claim against W.G. and L.D.  There are no allegations that W.G. or L.D. committed outrageous conduct in Matthew's presence.  The amended complaint alleges that Matthew "watched his brother's psychological torture in real time while they were both students in the School District."  Doc. 18, ¶ 60.)  It further alleges that he "witnessed the bullying of his brother and saw the visible decline in [Zachary's] mental health due to the psychological abuse."  (*Id.* ¶ 61.)  It alleges that on a given day, Matthew reported to School District officials that students were bullying Zachary.  (*Id.* ¶ 64.)  While these allegations in the amended complaint are suggestive of physical presence, they are insufficient for the claim of IIED by Matthew to be plausible.

The amended complaint does not allege any specific conduct by W.G. or L.D in Matthew's presence.  That being the case, the amended complaint has not presented facts sufficient to plausibly plead that W.G. or L.D. partook in extreme or outrageous conduct in Matthew's presence sufficient to allow Matthew to proceed with an IIED claim against them.  Therefore, the court will dismiss Count VI with respect to W.G. and L.D.

**D. The court will dismiss Count VII with respect to W.G. and L.D. because the Estate has not pleaded that W.G. or L.D. knew that their conduct was substantially certain to lead to Zachary's distress.**

W.G. and L.D. argue that Count VII fails for three reasons. (Doc. 34, pp. 18–20; Doc. 36, pp. 15–16.) First, it fails to allege conduct that rises to the level of extreme and outrageous. Second, most of the conduct it does allege is generally attributed to Student Defendants and not specifically to any particular defendant. And third, it fails to allege that W.G. and L.D. acted with the knowledge that Zachary's distress was substantially certain to occur. (Doc. 34, pp. 18–20; Doc. 36, pp. 15–16.) W.G. also argues that there is no evidence that W.G.'s conduct caused Zachary's distress. (Doc. 34, p. 20.) The specific conduct alleged against W.G. is the lollipop incident, which took place a year or more prior to Zachary's suicide. (*Id.*) Given the sparse pleadings and passage of, W.G. argues that causation is lacking. (*Id.*)

The Estate responds to some of these arguments. (Doc. 41, pp. 28–31.) But it does not respond to the argument that W.G. or L.D. are not alleged to have acted with knowledge or substantial certainty of Zachary's distress. (*Id.*) Instead, the Estate asserts that the amended complaint has established that each Student Defendant "specifically contributed to Zachary's ongoing bullying and suicide, and Matthew's anguish, and gave examples." (*Id.* at 31.) The Estate asserts that no more is required to survive a motion to dismiss.

Knowledge or substantial certainty is a requirement of an IIED claim.  W.G. and L.D. argue that it is not pleaded in the amended complaint.  Rather than contest this point, the Estate ignores it.  W.G. and L.D. are correct.  Knowledge or substantial certainty is not pleaded in the amended complaint.  Therefore, the court will dismiss Count VII with respect to W.G. and L.D.

CONCLUSION

For the reasons provided herein, the court will grant in part and deny in part the motions to dismiss.  The court will grant Officer Greenly's motion and therefore dismiss Count I insofar as it is brought against him.  (Doc. 23.)  The court will grant in part and deny in part T.F.'s motion to dismiss, granting it with respect to Count V and denying it with respect to Counts VI and VII.  (Doc. 26.) And the court will grant the motions to dismiss filed by W.G. and L.D. and dismiss the claims against them.  (Docs. 29, 35.)  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: March 28, 2024