## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOPE AMSPACHER, Administrator of the Estate of Zachary Kirchner, and MATTHEW KIRCHNER, | : | Civil No. 1:23-CV-00286 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| RED LION AREA SCHOOL DISTRICT, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This case arises from the tragic suicide of Zachary Kirchner ("Zachary") and his brother's subsequent discovery of Zachary's lifeless body. Currently submitted for the court's consideration are the respective motions to dismiss filed by Defendants Jason Hoffman ("Hoffman"), W.G., T.F., L.D., and D.M. ("Student Defendants"). (Docs. 60, 63, 65, 74, & 79.) The court must decide whether four of Plaintiffs' claims can proceed: a state-created danger claim against Hoffman (Count I), a negligence claim against Student Defendants (Count V), an intentional infliction of emotional distress ("IIED") claim against Student Defendants brought by Zachary's brother, Matthew Kirchner ("Matthew") (Count VI), and an IIED claim against Students Defendants brough by Zachary's estate ("Estate") (Count VII). For the following reasons, the court will dismiss the state-created danger claim. The court will also dismiss the negligence claim and Matthew's IIED claim

1

against W.G., L.D., and D.M.  Finally, the court will dismiss the Estate's IIED claim against W.G.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This is the second round of motions to dismiss in this matter.  The first round concerned Plaintiffs' first amended complaint.  (Doc. 18.)  This round concerns Plaintiffs' second amended complaint.  (Doc. 59.)  The second amended complaint contains the same core facts that the court summarized in its previous order.  (Doc. 55, pp. 2–8.)[1]  Rather than recount those facts here, the court will describe Plaintiffs' newly alleged facts.

The second amended complaint contains six new factual allegations by the court's count.  At issue presently, some of the new allegations concern specific Student Defendants.  Specifically, Plaintiffs allege that D.M. once stood in a park near Zachary's residence yelling that Zachary was a "faggot" and "fucking faggot." (Doc. 59, ¶ 42.)  So, too, Plaintiffs allege that "T.F. had relentlessly tormented [Zachary] since they were much younger" and continued bullying him into middle school and high school.  (*Id.* ¶ 43.)  T.F.'s bullying of Zachary got so bad that Zachary's parents spoke with T.F.'s parents/guardians, ultimately to no avail.  (*Id.* ¶¶ 44–45.)  The other new allegations generally aim to establish that Matthew personally witnessed bullying and/or harassment targeted at Zachary.  Plaintiffs

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

allege that "[Matthew] and classmates of [Zachary] and Students Defendants personally witnessed all Student Defendants verbally harassing and bullying [Zachary] both within RLASD schools and outside of school." (*Id.* ¶ 39.) Plaintiffs also allege that "[o]ther classmates of [Zachary] and Student Defendants, including [Matthew], personally saw harassing social media posts by L.D., D.M., T.F., and C.A., including those directing [Zachary] to kill himself." (*Id.* ¶ 47.)

Plaintiffs' second amendment of their complaint was spurred by the court's dismissal of some of the same claims presently at issue. The court dismissed without prejudice the negligence claim against T.F., L.D., and W.G., and Matthew's IIED claim against L.D. and W.G. (Doc. 56.)[2] The court did not dismiss the IIED claims against T.F. (*Id.*)

In the second amended complaint, Plaintiff renewed all the claims that the court dismissed without prejudice. Moving Defendants believe that Plaintiffs' amendment failed to cure the previously-identified deficiencies. Accordingly, Hoffman, W.G., T.F., L.D., and D.M. each filed a motion to dismiss and a brief in support. (Docs. 60, 61, 63, 64, 65, 66, 74, 75, and 79, 80.) Plaintiffs filed a brief in opposition to each motion. (Docs. 70, 71, 72, 77, and 81.) Only T.F. filed a reply brief. (Doc. 73.) The motions are ripe for review.

---

[2] The court also dismissed with prejudice the state-created danger claim brought against former defendant Officer Marc Greenly on qualified immunity grounds. (Doc. 56.)

## JURISDICTION

This case arises under both the laws of the United States and the laws of

Pennsylvania.  The court has subject matter jurisdiction over Plaintiffs' federal

claims pursuant to 28 U.S.C. § 1331 and their state law claims pursuant to 28

U.S.C. § 1367.  Venue is proper in this court.  *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

*Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead

to state a claim for relief," disregards the allegations "that are no more than

conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to

relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012), *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

### DISCUSSION

**A. Qualified Immunity Precludes Matthew's State-Created Danger Claim.**

According to Plaintiffs, Hoffman—a counselor at Red Lion Area Senior High School—conducted a wellness check on Zachary the day of his suicide at the request of Zachary's mother.  (Doc. 59, ¶¶ 15, 117.)  Hoffman's decision to take Matthew along to perform the wellness check and Matthew's subsequent discovery of Zachary's lifeless body are the bases for the state-created danger claim. Matthew claims that Hoffman took him to perform the wellness check despite being aware of the likelihood that Zachary had harmed himself and the dangerous conditions that would confront Matthew.  (*See id.*, ¶¶ 137–51.)  Matthew contends that Hoffman's conduct violated his "constitutionally protected . . . right to be free from unjustified intrusion upon [his] physical and emotional well-being."  (*Id.* ¶ 139.)  Hoffman argues, in part, that qualified immunity shields him from this claim.  (Doc. 64, pp. 8–10.)

The court has previously considered the applicability of qualified immunity with respect to Matthew's claim for state-created danger.  (Doc. 55, pp. 9–14.) Matthew initially brought this claim against both Hoffman and Officer Marc Greenly, another participant present at the wellness check.  Officer Greenly

5

previously moved to dismiss this count on qualified-immunity grounds.  (*Id.* at 9.)
The court's analysis focused on whether the right allegedly violated was clearly
established at the time of the wellness check.  (*Id.* at 12–13); *see generally*
*Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (overcoming qualified immunity
requires a showing "(1) that the official violated a statutory or constitutional right,
and (2) that the right was 'clearly established' at the time of the challenged
conduct").  The court concluded, in part, that there was no right in the Third
Circuit to be free from unjustified intrusion upon physical and emotional well-
being nor to be free from such intrusion upon emotional well-being absent physical
harm.  (Doc. 55, p. 13.)  Thus, the court found that qualified immunity shielded
Officer Greenly.

Hoffman's motion asks the court to apply the same conclusion to the state-
created danger claim against him.  In fact, he argues that the law-of-the-case
doctrine necessitates dismissal of the claim against him.  (Doc. 64, p. 10.)
Plaintiffs do not address the fact that the court has previously ruled on this issue.
Instead, they attempt to relitigate it.  Plaintiffs suggest that the court's prior
conclusion is misguided, because precedent supports state-created danger claims
based on either physical or mental harm.  (Doc. 71, pp. 21–22.)  Just as they did
before, Plaintiffs primarily rely *on L.R. v. School District of Philadelphia*, 836 F.3d
235 (3rd Cir. 2016) and *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) to argue

6

that a broad right to be free from intrusion upon physical and mental well-being

exists and was a clearly established right at the time of this incident.  (Doc. 71, pp.

21–23.)  Plaintiffs' arguments are unavailing.  The holdings of those cases cannot

be separated from their facts.  Indeed, the right at issue in a qualified immunity

analysis must be analyzed "in light of the specific context of the case, not as a

broad general proposition."  *See L.R.*, 836 F.3d at 248 (quoting *Saucier v. Katz*,

533 U.S. 194, 201 (2001)).

In *L.R.*, a teacher permitted a kindergartener to leave school with a stranger

who ultimately sexually assaulted her.  836 F.3d at 239–40.  In *White*, police

officers arrested a car's driver and abandoned the children in the car on a highway

in Chicago, forcing the children to cross eight lanes of traffic and wander the

highway in search of a telephone.  592 F.2d at 382.  *L.R.* and *White* both involved

instances where the public official put a child in a situation that obviously involved

physical danger.  Moreover, the cases upon which the *L.R.* court relied in reaching

its holding involved instances in which plaintiffs were put into physical danger.

*See Rivas v. City of Passaic*, 365 F.3d 181, 194–96 (3rd Cir. 2004) (first

responders created danger for plaintiff when they told police that plaintiff assaulted

them without telling the police officers that the plaintiff had a seizure condition);

*Currier v. Doran*, 242 F.3d 905, 909–10 (10th Cir. 2001) (state social workers

recommended that a father obtain custody of children then failed to investigate

7

known signs and allegations of the father's child abuse); *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1256–57 (10th Cir. 1998) (school officials sent a special education student home after he made threats against a teacher, despite knowing the student had suicidal ideations and access to firearms at home); *Kneipp v. Tedder*, 95 F.3d 1199, 1202–03 (3rd Cir. 1996) (police officer separated a wife from her husband then abandoned her, causing her to be exposed to dangerously cold conditions, which led to permanent physical injury); *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989) (police officer abandoned a female passenger after arresting the driver in an area with one of "the highest aggravated crime rate[s] in the county," which ultimately led to the woman being raped); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982) (decedent was murdered by a patient after personnel at a public mental health center released the patient despite knowing he was dangerous).

Nothing about the facts of those cases suggest that putting an individual in an *emotionally* harmful situation violated a clearly established right. Plaintiffs rely on cases that clearly involved physical danger, while arguing this court need not be "constrained by the antiquated thought that the only actionable injuries are intrusions upon purely physical well-being." (Doc. 71, p. 22.). Yet, Plaintiffs fail to point to a single case in which a state-created danger claim was predicated on intruding upon one's emotional well-being absent any risk of physical harm. The

right to be free from unjustified intrusion of one's physical well-being and the right to be free from unjustified intrusion of one's mental well-being are distinct rights. Equating the two would require defining the allegedly violated right in this case at a higher level of generality than is appropriate. *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (explaining the Court has repeatedly stated that clearly established law should not be defined at a "high level of generality"). Accordingly, the court stands by its previous holding: a right to be free from unjustified intrusion upon emotional well-being absent physical harm was not a clearly established right at the time of Hoffman's conduct.

Plaintiffs explain that the emotional trauma Matthew suffered has manifested into physical symptoms, "including post-traumatic stress symptoms, severe depression, frequent nightmares, intense headaches, and stomach pain." (Doc. 71, p. 23.) The court does not doubt that emotional trauma can cause physical symptoms, especially in a severely traumatic experience like the one Matthew suffered. But, Matthew does not allege any of this physical harm in his second amended complaint. He cannot make up for this omission in his opposition brief. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3rd Cir. 1988) (explaining a brief in opposition to a motion to dismiss may not amend a complaint).

For the foregoing reasons, the court will dismiss Count I with prejudice.

**B. Pennsylvania does not Recognize Recovery for Suicide in Negligence, Absent Certain Exceptions.**

Student Defendants move to dismiss Count V of Plaintiffs' second amended complaint.  Plaintiffs style Count V's cause of action as "Gross Negligence and/or Recklessness."  (Doc. 59, p. 27.)  For the purpose of this discussion, this is a negligence claim.  *See Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 215 n.2 (3rd Cir. 2010) ("[T]here is no separate cause of action under Pennsylvania law for gross negligence."); *Monroe v. CBH20, LP*, 286 A.3d 785, 799 (Pa. Super. Ct. 2022) ("[G]ross negligence and recklessness are states of mind; they are forms of negligence, not independent causes of action.").  In essence, Count V alleges that the Students Defendants' negligence caused Zachary's suicide.

In the previous round of motions to dismiss, T.F., W.G., and L.D. successfully moved to dismiss Count V.  The court dismissed the claim because Plaintiffs failed to identify an applicable duty of care in the first amended complaint.  (Doc. 55, p. 15–16.)  Plaintiffs appear to have remedied that deficiency in the second amended complaint.  Plaintiffs now allege that "Student Defendants owed a general duty of care imposed on all persons not to expose others, include [Zachary], to reasonably foreseeable risks of injury."  (Doc. 59, ¶ 174.)

In response, Student Defendants present argument concerning why the Student Defendants had no duty to Zachary to refrain from bullying him.  (Doc. Doc. 61, p. 10; Doc. 66, p. 11; Doc. 75, p. 12; Doc. 80, p. 13.)   They generally

10

contend that the five factors for determining the existence of a duty described in *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000), weigh against recognizing such a duty. Whether Students Defendants owed a duty to Zachary to refrain from bullying him appears to be a novel issue under Pennsylvania law. No party has cited controlling Pennsylvania authority on the issue, and the court's own review of the caselaw yielded no on-point case. The court, however, need not wade into the murky waters of predicting whether Pennsylvania courts would recognize a duty in this case. That is because, as T.F. and D.M correctly note, Pennsylvania law does not recognize suicide as a cognizable basis for recovery in negligence, absent exceptions that are not applicable here.

The causation element of a negligence claim requires an alleged tortfeasor's negligence to be both the cause in fact and the proximate cause of the plaintiff's injury. *Galullo v. Federal Exp. Corp.*, 937 F. Supp. 392, 394 (E.D. Pa. 1996). Of course, multiple forces may contribute to a plaintiff's injury. This reality does not necessarily relieve a tortfeasor of liability. "One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third party may have contributed to the final result." *Bleman v. Gold*, 246 A.2d 376, 380 (Pa. 1968) (quoting *Stark v. Lehigh Foundries, Inc.*, 130 A.2d 123, 130 (Pa. 1957)). Negligence will not give rise to liability, however, when an intervening act is

11

deemed a superseding cause of the injury.  *See Corbett v. Weisband*, 551 A.2d 1059, 1073 (Pa. Super. Ct. 1988).  Under long-standing Pennsylvania law, determining whether an intervening act is a superseding cause turns on "whether the intervening conduct was so extraordinary as not to have been reasonably foreseeable."  *Powell v. Drumheller*, 653 A.2d 619, 623 (Pa. 1995); *accord Hendricks v. Pyramid Motor Freight Corp.*, 195 A. 907, 909 (Pa. 1938).

An occurrence as extraordinary as suicide presents a superseding-cause issue.  Pennsylvania law generally recognizes that "suicide constitutes an independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor."  *McPeake v. William T. Cannon, Esquire, P.C.*, 553 A.2d 439, 441 (Pa. Super. Ct. 1989).  Accordingly, Pennsylvania's general rule "is that liability cannot be imposed upon third parties for another's suicide."  *Estate of Puza v. Carbon Cty.*, 586 F. Supp. 2d 271, 274 (M.D. Pa. 2007).  Pennsylvania's rule comports with the general consensus among courts across the country that consider suicide a superseding cause.  *See* Alex B. Long, *Abolishing the Suicide Rule*, 113 Nw. U. L. Rev. 767, 783–85 (2019) (explaining that U.S. courts widely accept the notion that "suicide is a superseding cause of death").

Courts applying Pennsylvania law have consistently relied on this rule to bar negligence claims arising from suicide.  *See, e.g.*, *Sullivan v. Truist Bank*, 715 F.

Supp. 3d 668, 672–74 (E.D. Pa. 2024); *Ferris v. Cleaveland*, No. 3:10-cv-1302, 2012 WL 2564782, at *1 (M.D. Pa. July 2, 2012); *Estate of Puza*, 586 F. Supp. at 274–76, *aff'd sub nom. Barker-Puza v. Carbon Cty.*, 304 F. App'x 47 (3rd Cir. 2008); *Cooper v. Frankford Health Care Sys., Inc.*, 960 A.2d 134, 146–47 (Pa. Super. Ct. 2008).

Plaintiffs fail to argue why the Pennsylvania rule should not preclude their negligence claim.  Although Pennsylvania law recognizes certain discrete exceptions to the general rule, none of them apply here.  One exception exists for "suits brought under the worker's compensation statute." *McPeake*, 553 A.2d at 441.  Another exists for cases involving mental health institutions and professionals, "where there is a custodial relationship and the defendant has a recognized duty of care towards the decedent." *Id.*  Finally, for cases not involving health care institutions, liability could be predicated upon "both a clear showing of a duty to prevent the decedent's suicide and a direct causal connection between the alleged negligence and the suicide." *Id.*  Nothing suggests, nor do Plaintiffs argue, that any of these exceptions would save Count V.

Beyond the recognized exceptions, the court's research has identified a few cases in which courts have refused to follow the general rule, even though no recognized exception applied.  For instance, in one case, the Pennsylvania Court of Common Pleas found that a decedent's administratrix could assert negligence

13

claims against a driver and the driver's employer when the decedent committed suicide after being unable to cope with pain and depression resulting from a car accident caused by defendants. *Mackin v. Arthur J. McHale Heating & Air Conditioning Co.*, 76 Pa. D. & C.4th 544, 549–50 (2005); *see also Hudak-Bisset v. Cty. of Lackawanna*, 37 Pa. D. & C.5th 159 (2014) (general rule did not preclude plaintiff from amending negligence claim against defendant who hit decedent with a bus causing him crippling chronic pain that ultimately led to the decedent's suicide). So, too, the Western District of Pennsylvania has found reason not to apply Pennsylvania's general rule absent an exception. *See Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 559–60 (W.D. Pa. 2019) (declining to follow general rule because a former employee's attempted suicide following her termination "was more foreseeable than the suicides in *McPeake* and *Cooper*" because she expressed her suicidal ideations to her former colleagues).

This court will not follow these cases in departing from the general rule. With regard to *Mackin* and *Hudak-Bisset*, two state trial court holdings is not enough to deviate from a well-established state law rule. *See Ferris*, 2012 WL 2564782, at *2 (refusing to deviate from general rule based on *Mackin* holding); *see also Spence*, 623 F.3d at 216–17 (explaining that in the absence of controlling authority from a state supreme court, a federal court sitting in diversity "must look to decisions of state intermediate appellate courts, of federal courts interpreting the

14

state law, and of other state supreme courts that have addressed the issue.").  With

regard to *Sabo* this court is unconvinced that court's holding accurately reflects the

controlling law in this context.  The *Sabo* court distinguished the facts of its case

from *McPeake* but failed to address why the broader principle of Pennsylvania law

articulated in *McPeake* and other cases did not apply.  As explained above, this

court is not convinced that *McPeake* represents a fact-limited holding.  Ultimately,

this court finds no reason to deviate from Pennsylvania's well-established law and,

thus, will dismiss Plaintiffs' negligence claim with prejudice.

### C. Intentional Infliction of Emotional Distress

W.G. , L.D., and D.M. seek to dismiss the two IIED claims lodged against

them.  One of those claims, Count VII, is brought by the Estate.  (Doc. 59, ¶¶ 187–

92.)  The other, Count VI, is brought by Matthew on the theory that he was a

bystander to Student Defendant's intentional infliction of emotional distress upon

Zachary.  (*Id.* ¶¶ 181–86).  T.F. does not seek dismissal of the IIED claims against

him.  Rather, he simply seeks dismissal of the punitive damage claims associated

with Counts VI and VII.

An IIED claim requires three showings: "(1) the defendant's conduct was

extreme and outrageous; (2) the conduct caused the plaintiff severe emotional

distress; and (3) the defendant acted intending to cause such distress or with

knowledge that the same was 'substantially certain' to occur."  (*Dobson v. Milton*

*Hershey Sch.*, 356 F. Supp. 3d 428, 439 (M.D. Pa. 2018) (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217–18 (3rd Cir. 2001)).  With these elements in mind, the court will address Defendants' arguments.

### 1.  W.G.'s conduct was not extreme and outrageous as a matter of law.

W.G. argues, in part, that the IIED claims against him must fail, because his alleged conduct was not extreme and outrageous as a matter of law.  Plaintiffs respond that it would be inappropriate for the court to look at "individual aspects of [W.G.'s] conduct in a vacuum."  (Doc. 70, p. 23.)  Rather, Plaintiffs insist that W.G. acting in concert with the other defendants with "herd mentality" to bully Zachary for years was outrageous.  (*Id.* at 22–23.)  Plaintiffs' further argue that W.G.'s conduct constituted "torture."  (*Id.* at 23.)

It is well established that only the most extreme and outrageous conduct will give rise to an IIED claim.  *See Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3rd Cir. 1988) (admonishing that "Pennsylvania courts have been chary to declare conduct 'outrageous'"); *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (explaining the tort is reserved for "only the most clearly desperate and ultra extreme conduct").  Indeed, the conduct must be "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society."  *Televandos v. Vacation Charters, Ltd.*, 264 F. App'x 190, 192 (3rd Cir. 2008) (quoting *Hoy*, 720

A.2d 745 at 754). "[M]ere insults, indignities, threats, annoyances, petty oppressions, and other trivialities" do not constitute extreme and outrageous conduct. *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 543 (M.D. Pa. 2009) (quoting *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 310 (M.D. Pa. 1988); *accord* Restatement (Second) of Torts § 46, cmt. d (Am. Law Inst. 1965).

Plaintiffs mostly rely on group allegations concerning the Student Defendants' conduct. These alone are insufficient to put W.G. on notice of the claims against him. *See McMillan v. Lycoming Cty.*, 4:23-cv-00561, 2024 WL 315725, at *5 (M.D. Pa. Jan. 26, 2024) (quoting *Pollard v. Clark*, No. 20-cv-00194, 2021 WL 5911055, at *3 (W.D. Pa. Nov. 4, 2021) ("Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient."). Plaintiffs allege only one instance of bullying specifically attributable to W.G. When the children were in eighth grade—the year before Zachary's suicide—"W.G. went up to [Zachary] with a lollipop making sexual gestures and making gay jokes such as 'I got a lollipop for you.'" (Doc. 59, ¶ 40.) This conduct, while inappropriate and hurtful, is not extreme and outrageous.

W.G. cites several cases from this circuit—including two from this district, that have considered the outrageousness of conduct in the school context—but *Price ex rel. O.P. v. Scranton School District*, No. 11-cv-0095, 2012 WL 37090 (M.D. Pa. Jan. 6, 2012), is particularly instructive. The court discussed *Price* in its

previous order.  (Doc. 55, p. 18.)  In *Price*, classmates began harassing a girl after they learned she contracted a yeast infection.  2012 WL 37090, at *2.  Eventually, the harassment escalated to the point that the classmates were calling the girl derogatory names like "bitch, skank, slut, tramp, and whore."  *Id.* (internal quotations omitted).  The students continued leveling verbal attacks throughout the school year, into the summer, and even into the next school year.  *Id.* at *2–3.  This sustained harassment caused the girl to suffer from posttraumatic stress disorder, depression, and anxiety, and led her to contemplate suicide.  *Id.* at *4.  In determining the classmates' conduct was not cognizably outrageous, the court applied Pennsylvania's general rule that "sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for [IIED]."  *Id.* at *12 (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1487 (3rd Cir. 1990)).  Moreover, the *Price* court distinguished its case from *DiSalvio v. Lower Marion High School District*, 158 F. Supp. 2d 553 (E.D. Pa. 2001), a case in which a school employee's sexual harassment of a student was deemed outrageous for the purposes of an IIED claim.  *Price*, 2012 WL 37090, at *2.  The *Price* court reasoned that its case did not involve the same power imbalance that was present in *DiSalvio*.  *Id.*

It is not apparent that W.G.'s alleged singular instance of harassing Zachary is as severe as the continuous conduct deemed insufficiently outrageous in *Price*.

At most, W.G.'s conduct is of a similar nature to the harassment in *Price*.

Moreover, no power imbalance existed between W.G. and Zachary.  Plaintiffs do

not present any authority supporting their contention that W.G.'s conduct was

outrageous and extreme.  Instead, plaintiffs' argument focuses mostly on disputing

W.G.'s purported characterization of his conduct as "childish taunting" and

accusing W.G. of attempting to "hide behind the lens of only being a child."  (Doc.

70, p. 23.)  This argument is beside the point.  W.G.'s alleged conduct—while rude

and demeaning—was not sufficiently outrageous to support an IIED claim no

matter how one characterizes it.  Accordingly, the court will dismiss both IIED

claims against W.G.

Further amendment of this claim would be futile.  Plaintiffs' specific

allegations concerning W.G.'s conduct have not changed in any of their three

complaints.  (*See* Docs. 1, 18, & 59.)  Thus, the court will dismiss the claims with

prejudice.

### 2. Matthew failed to allege adequately that he was present for L.D.'s or D.M.'s alleged tortious conduct.

L.D. and D.M. move to dismiss Matthew's IIED claim against them.  They

argue that Matthew has failed to allege that he was present for their alleged

outrageous conduct directed at Zachary.  The court previously determined that

Matthew's claim failed for this reason.  (Doc. 55, pp. 21–22.)  As the court

explained, an individual suffering emotional distress as a result of conduct directed

at another "must be present when the outrageous conduct is directed at the third person." *Johnson v. Caparelli*, 625 A.2d 668, 672 (Pa. Super. Ct. 1993).  Plaintiffs acknowledge *Johnson's* holding and do not dispute that Matthew must have been present for L.D.'s and D.M.'s outrageous conduct for the IIED claim to pass muster.  (*See* Doc. 77, pp. 24–25; Doc. 81, p. 25.)  So, the survival of Matthew's claim will depend on whether the second amended complaint cured this defect.

The court previously held that some of Matthew's allegations were "suggestive of physical presence," but nevertheless insufficient to support his IIED claim.  (Doc. 55, p. 22.)  Plaintiffs only cite to one new allegation in arguing that Matthew sufficiently pleaded his presence.  (*See* Doc. 77, p. 25; Doc. 81, p. 25.)  That allegation states: "[Matthew] personally witnessed acts of bullying and/or harassment towards [Zachary] by each individual Student Defendant."  (Doc. 59, ¶ 183.)  Only one other new allegation in the second amended complaint even concerns Matthew's presence.  It states: "[Matthew] and classmates of [Zachary] and Student Defendants personally witnessed all Student Defendants verbally harassing and bullying [Zachary] within RLASD schools and outside of schools." (*Id.* ¶ 39.)  No new allegations reveal what outrageous conduct Matthew actually witnessed and whether it was attributable to L.D. or D.M.  These general allegations without such factual development are plainly insufficient to survive a Rule 12(b)(6) challenge.  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

557)) ("[A] formulaic recitation of the elements of a cause of action will not do.").

Accordingly, Matthew's IIED claims against L.D. and D.M. fail.[3]

Like the negligence claim, further amendment of this claim would be futile. The court gave Matthew an opportunity to amend after identifying the claim's defects, yet those same defects are still present. Therefore, the court will dismiss Matthew's claim with prejudice.

### 3. The Estate adequately pleaded the IIED claim against L.D. and D.M.

#### i. Extreme and outrageous conduct

L.D. contends that the Estate's claim fails because Plaintiffs fail to allege conduct specifically attributable to L.D. (Doc. 75, p. 17.) D.M. similarly faults Plaintiffs for failing to allege conduct specifically attributable to D.M., Doc. 80, p. 21, except for one instance when D.M. allegedly stood outside Zachary's home yelling to Zachary that he was a "fucking faggot." (Doc. 59, ¶ 42). These arguments ignore important allegations in the second amended complaint.

In fact, Plaintiffs attribute specific conduct to both D.M. and L.D. Specifically, Plaintiffs allege L.D. and D.M. "repeatedly called [Zachary] 'faggot.'" (*Id.* ¶ 41.) Moreover, Plaintiffs allege that L.D. and D.M. "told

---

[3] The court takes note that Plaintiffs newly allege that Matthew "personally saw harassing social media posts" that directed Zachary "to kill himself." (Doc. 59, ¶ 47.) Plaintiffs have not argued that Matthew viewing harassing posts on social media constitutes physical presence for the purpose of his IIED claim. Accordingly, the court will not analyze an argument not raised by Plaintiffs.

[Zachary] to kill himself in person, over text messages, and/or other messaging services and made similar posts on social media for [Zachary] and other classmates to see." (*Id.* ¶ 46.) L.D. and D.M. allegedly engaged in this conduct despite an alleged awareness of Zachary's suicidal thoughts. (*See id.* ¶ 48.) This is precisely the conduct that the court previously determined was sufficiently outrageous to survive a motion to dismiss. (Doc. 55, p. 19.) Given this previous ruling, the court is not persuaded by L.D.'s and D.M.'s arguments on this element.

### ii. Causation

D.M. argues that due to the lack of individualized allegations about his conduct, "it cannot be determined that such actions caused Zachary severe emotional distress." (Doc. 80, pp. 21–22.) D.M.'s argument suffers from the same flaw as his argument concerning the first element. As noted above, there are specific allegations that D.M. repeatedly called Zachary slurs and told him to kill himself. Moreover, Plaintiffs plausibly allege that D.M.'s conduct took place approximately during the time period that Zachary was experiencing emotional distress, *i.e.*, when the students were in eighth and ninth grade. Given these allegations, there can be little doubt that the causation element of the Estate's claim is adequately pleaded.

### iii. Intent or substantial certainty

Finally, L.D. argues that Plaintiffs do not adequately allege that L.D. intended to cause Zachary's emotional distress or acted with knowledge that such distress was substantially certain to occur. (Doc. 75, p. 17.) L.D. successfully advanced a similar argument in the first round of motions to dismiss. (Doc. 55, pp. 23–24.) In that round, the court determined that Plaintiffs' first amended complaint failed to allege this intent element. (*Id.*) Plaintiffs' second amended complaint is different. It specifically alleges that the Student Defendants knew Zachary was experiencing "mental distress and, in fact, attempted suicide in the past." (Doc. 59, ¶ 188.) It also alleges that Student Defendants acted with knowledge that Zachary's distress was substantially certain to occur. (*Id.* ¶ 189.) These newly added allegations are supported by the other allegations in the second amended complaint. For instance, L.D. allegedly was aware that Zachary was gay, yet still repeatedly directed slurs at him. (*See id.* ¶¶ 37, 41.) So, too, L.D. allegedly was aware that Zachary was suicidal, yet still told Zachary to kill himself in person and online. (*See id.* ¶¶ 46, 48.) These allegations are enough to survive L.D.'s and D.M.'s challenges. Thus, the court will deny L.D.'s and D.M.'s motion to dismiss Count VII.

### 4. It is premature to dismiss the Estate's claims for punitive damages on its IIED claim.

T.F. seeks to dismiss only Plaintiffs' claims for punitive damages. (Doc. 66, pp. 16–17.) T.F. contends that the alleged conduct is not sufficiently outrageous to justify punitive damages. (*Id.*) Plaintiffs retort, in part, that the propriety of punitive damages in this matter requires factual determinations not appropriately made at this stage of litigation. (*See* Doc. 72, p. 21.) Plaintiffs are correct.

The fact-intensive nature of awarding punitive damages makes resolution of the issue on a motion to dismiss inappropriate. *See Fiedler v. Stroudsburg Area Sch. Dist.*, 427 F. Supp. 3d 539, 558 (M.D. Pa. 2019). Pennsylvania law is settled that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchinson ex rel. Hutchinson v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (quoting *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)). Whether conduct is outrageous enough to support punitive damage is a factual issue for the trier of fact. *See Corbett v. Morgenstern*, 934 F. Supp. 680, 685 (E.D. Pa. 1996); *see also* Restatement (Second) of Torts § 908, cmt. d ("Whether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact . . . .").

Plausible allegations of outrageous conduct that support an IIED claim can similarly support claims for punitive damages. *See, e.g.*, *Seymour v. Life Care Ret.*

*Cmtys., Inc.*, No. 09-cv-0444, 2009 WL 2007056, at *2 (W.D. Pa. July 9, 2009);

*Corbett*, 934 F. Supp. at 685.  Here, the court previously determined that T.F.'s

conduct may plausibly be considered sufficiently outrageous for the IIED claims.

(Doc. 55, p. 19.)  T.F. allegedly told Zachary "to kill himself in person, over text

messages, and/or other messaging services and made similar posts on social media

for [Zachary] and other classmates to see."  (Doc. 59, ¶ 46.).  T.F. made these

statements notwithstanding his alleged awareness of Zachary's suicidal ideations.

(*See id.* ¶ 48.)  Like the IIED claim, these allegations of outrageous conduct can

plausibly support Plaintiffs' claims for punitive damages at this stage of litigation.

Accordingly, the court will deny T.F.'s motion to set aside Plaintiffs' prayer for

punitive damages.

CONCLUSION

For the foregoing reasons, the court will dismiss with prejudice the state-created danger claim (Counts I).  The court will also dismiss with prejudice the negligence claim against W.G., L.D., D.M., and T.F. (Count V); Matthew's IIED claim against W.G., L.D., and D.M. (Count VI); and the Estate's IIED claim against W.G. (Count VII).  Finally, the court will deny T.F.'s motion to dismiss Plaintiffs' prayer for punitive damages.  An implementing order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: October 30, 2024